IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
(HOUSTON DIVISION)

| | | |
|---|---|---|
| STEVEN CRAIG PATTY, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE #:_____ |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| JAVIER F. PEÑA, | § | |
| SIX UNKNOWN FEDERAL AGENTS, | § | |
| a/k/a JOHN DOES 1-6, | § | |
| HARRIS COUNTY, TEXAS, | § | |
| DETECTIVE MARK REYNOLDS, and | § | |
| SIX UNKNOWN STATE ACTORS, | § | |
| a/k/a JOHN DOES 7-12, | § | |
| Defendants. | § | PARTIAL JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff STEVEN CRAIG PATTY [hereinafter "Craig Patty"] files this Complaint against the various named and unknown Defendants, and for cause of action, would respectfully show the Court the following:

### Nature of the Case

1.      This Federal Torts Claim Act ["FTCA"], constitutional tort and civil rights case involves a bizarre set of facts that, were they not true, would *almost* seem "implausible."[1]  In November of 2011, without either the knowledge or consent of Craig Patty, agents of the federal and state government commandeered his business property and used it for a "sting" operation against Mexican drug lords.  This is, in and of itself, astonishing and unlawful.  But, to add insult to injury,

---

[1]  In the wake of the duo of Supreme Court cases that numerous academics conflate as "*Twiqbal*," the "short plain statement" requirement of Rule 8 has been superceded, or at least supplemented, by one requiring a "plausible" allegation.  *See e.g., Twiqbal: A Political Tool,* 37 J. Legisl. 200 (2012).  Although it is surprising that the Government would act in the ways that are detailed herein, the facts, if proven to be true, certainly satisfy that pleading requirement. Nevertheless, the *Twiqbal* requirements necessitate this rather fulsome factual pleading.

when the government's plans went awry, and Patty's commercial truck was riddled with bullet holes, wrecked, and his driver killed inside the truck, instead of apologizing to this law abiding citizen and paying for the damage to his property and his business, the government, which had betrayed him, actually turned on him.  Patty files this suit to obtain justice for these wrongdoings.

## Parties

2.      Plaintiff STEVEN CRAIG PATTY is a law-abiding citizen of Aledo, Texas.  In July 2011 he started a trucking business known as Craig Thomas Expeditors.

3.      Defendant United States of America [hereinafter "USA"] is the first named Defendant in this case.  Some of the acts and omissions giving rise to this suit were done by federal agents, including *inter alia* employees of the federal Drug Enforcement Administration ["DEA"] acting within the course and scope of their employment for the Government.  Consequently, in accordance with the FTCA, 28 U.S.C. § 2671, *et.seq.*, the "United States" is vicariously liable for the tortious conduct of its federal agents and those in concert with them whose acts are imputable to the Government.

4.      Javier F. Peña is the head of the Houston office of the DEA.[2]  He took over that job in August of 2011.  Mr. Peña is personally liable under *Bivens* and its progeny for the federal common law constitutional torts alleged herein.  He may be served at his office at 515 Rusk, Houston, Harris County, Texas.

5.      In this case, as in *Bivens*, the names of all of the federal agents involved in the various violations of Craig Patty's constitutional rights are not known.  Accordingly, they are named as "John Does."  JOHN DOES 1-5 are the individual federal officers subordinate to Mr. Peña who authorized, participated in, or ratified the constitutional violations set forth herein.  JOHN DOE 6

---

[2]  *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).

is the highest federal official in Washington, D.C. who authorized or otherwise sanctioned the violation of Craig Patty's constitutional rights.  Because this was an *undercover* operation gone horribly wrong, Plaintiff Patty has no way, without formal discovery from this Court, to learn their identities.  However, once their identities are learned through discovery, Patty will seek leave to amend his pleadings and name them properly as defendants.  Under *Bivens,* they are liable for constitutional torts in their individual capacities.

6.     Harris County, Texas is a governmental entity.  It is a named Defendant because, on the occasion in question, Detective Mark Reynolds  and other unknown and unnamed agents acting under color of state law and within the course and scope of their employment, conspired and collaborated with federal agents, to use Patty's commercial property, his business assets, and his employee/driver, for unauthorized purposes and activities, in the furtherance of government objectives.  This state subdivision is liable for the federal constitutional torts alleged herein pursuant to 42 U.S.C. § 1983.

7.     Detective Mark Reynolds was, in November of 2011, an employee of Harris County, Texas, acting in the course and scope of his employment.  He, too, is personally liable under § 1983.  His address is presently unknown, but every effort will be made to learn his address and serve him with a copy of this lawsuit.  Harris County is vicariously liable for Detective Reynolds' constitutionally tortious behavior.

8.     JOHN DOES 7-12 are the other individual state and county officers who, acting under color of state law,  authorized, participated in, or ratified the unlawful and unreasonable conduct set forth herein.  Because this was an *undercover* operation, Plaintiff Patty has no ability, without formal discovery from this Court, to learn their identities.  However, once their identities are learned

through discovery, Patty will seek leave to amend his pleadings and name them properly as defendants, who are liable under the § 1983 theory.

## Jurisdiction and Venue

9.      Jurisdiction of the FTCA claims against the USA is conferred by 28 U.S.C. § 1346(b). Jurisdiction over the *Bivens* claims against Defendant Peña and the John Doe federal officers is conferred by 28 U.S.C. §§ 1331 and/or 1343.  Jurisdiction over the § 1983 claims against Harris County, Detective Reynolds, and the John Doe state actors, is also conferred by 28 U.S.C. §§ 1331 and/or 1343.  The Court may also have supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  The amount in controversy is substantially in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

10.      Many of the actions giving rise to this cause of action happened within this District. Therefore, venue is permissible in this District pursuant to 28 U.S.C. §§ 1391, 1402(b).

## Satisfaction of Conditions Precedent for FTCA Claims

11.      Prior to the filing of this suit, Plaintiff Patty filed the administrative claim required by 28 U.S.C. § 2672.  The claim was denied by letter from the U.S. Department of Justice dated July 8, 2013.  After denial of that claim, this suit has been timely filed, within the 180-day period established by 28 U.S.C. § 2401(b) and set out in the letter.

## Facts

This suit has been necessitated by virtue of the following facts.

## "Timing is Everything"

12.      The facts of this case are, albeit astonishing, actually quite simple.  In July of 2011, after spending approximately 15 years working for Alcon Laboratories in North Texas, 50-year old Craig Patty decided that it was time to open his own business, and to capitalize on the prosperity

brought by oil and gas domestic shale development including that from the Eagle Ford Shale areas of South Texas.  Patty and his father Thomas started their own little trucking company called Craig Thomas Expeditors.  He purchased a truck and hired a man named Joe Lopez to drive it.

13.    In August of 2011, two things happened that would change Craig Patty's life.  The first was that DEA Agent Javier Peña, a law enforcement officer whose roots run to Laredo, Webb County, Texas, in the Rio Grande Valley, was promoted from his job in Puerto Rico to head up the Houston office of the DEA.  The second is that a man named Lawrence Chapa, who, unbeknownst to Patty, had a long history of arrests, including one for cocaine possession, was arrested for tossing a tire through the window of a Goodyear store in downtown Houston.

14.    Craig Patty bought his second truck, a red 2006 Kenworth T600 in September of that same year.  That same month his driver Lopez was sharing a room with Chapa at a truck driver seminar in Fort Worth.  Through Lopez, Chapa approached Craig about being hired to drive the second red Kenworth.  Patty checked Chapa's record with the Department of Transportation ["DoT"].  The record was free of criminal convictions.  On information and belief, it is alleged that the Drug Task Force officers named herein arranged for Chapa to have a clean record and orchestrated his hiring by Patty.

### Mr. Peña's Plan

15.    A sting operation which involves (a) the deliberate planting of illegal drugs in a vehicle, (b) the transportation of those drugs over the highways of Texas, (c) the use and compensation of a confidential informant like Chapa, and (d) the surreptitious misappropriation of a private citizen's property for police work, simply does not happen without the approval of the head of the DEA office in Houston.  Therefore, it is alleged on information and belief that Javier Peña personally approved of, or ratified, the entire sting operation, including the use of Patty's property

and employee in violation of his Fourth and Fifth Amendment Rights.  Consequently, Agent Peña is personally liable under *Bivens* and its progeny.  As noted in ¶ 5 *supra*, IF the involvement of Patty's property was sanctioned by Senior DEA and/or DoJ officials in Washington, named herein as JOHN DOE 6, then that person(s) would also be a proper party defendant with personal liability for such constitutional torts.

16.     The plan was straight out of a dramatic television script.  Mr. Peña and the unknown federal agents, acting in collaboration with Detective Reynolds and other personnel from the Harris County, Texas, Sheriff's office, and, perhaps, in cooperation with other unknown and unidentified actors, decided to try to catch some bad guys from the Mexican Zeta drug cartel.  The bad guys were smuggling illegal drugs from Mexico into Texas.  To do this, the government agents, operating via a High-Intensity Drug Trafficking Area Task Force [hereinafter "Drug Task Force"], set up a "sting" operation.  For convenience purposes, this pleading refers to all law enforcement officers participating in this operation, whether federal or state, collectively as the "Drug Task Force."

17.     Unbeknownst to Craig Patty, in September of 2011 when he bought the red Kenworth truck, Lawrence Chapa was either already, or was shortly about, to become, a "confidential informant" for the DEA and its law enforcement compatriots in the Drug Task Force.  Therefore, although Patty was paying Chapa's salary, providing the truck for him to drive, and paying for the gas, instead of pursuing Patty's legitimate business interests, Lawrence Chapa was actually working in an undercover sting operation for the Drug Task Force.

18.     On or about November 21, 2011, in furtherance of their plan for the sting, officers of the Drug Task Force arranged for Lawrence Chapa to drive Patty's truck to Rio Grande City, Texas.  Chapa told Patty that he was having the truck repaired in Houston for a return drive  to

California.  In fact, on orders of his Drug Task Force handlers, he drove it to Rio Grande City instead, where it was loaded up with marijuana, and, perhaps, other illegal narcotics or contraband.

19.     Lawrence Chapa's drive from South Texas to Houston was, by all appearances, uneventful.  On information and belief it is alleged that the truck was "precleared" by agents working on the Drug Task Force sting operation, so that it was neither stopped, nor searched, nor confiscated.

### Shoot-Out in the "Wild, Wild West"

20.     When the red Kenworth arrived in Houston, all Hell broke loose.[3]  The plan for the sting was for Lawrence Chapa to *rendezvous* with the bad guys so that a transfer of the illegal drugs could be made.  At that point, the Task Force officers would swoop in and make arrests.  But the officers of the Drug Task Force were outwitted by the Mexican drug lords.  On Monday afternoon, November 21, 2011, the truck was intercepted in Northwest Houston by outlaws from the Zeta cartel, driving in three sport utility vehicles.  An intense fire-fight ensued.  An undercover Harris County Sheriff's Deputy was wounded, and Lawrence Chapa was shot eight times and killed.  Patty's red truck was wrecked and riddled with bullet holes.

21.     It was a major fiasco; and a major media event on the evening news.  For example, KTRK ran a six and a half minute story on the shooting.  The footage clearly depicted the license plate of Patty's truck, making him fear, of course, that his identity would be discovered by the Zeta cartel and that they, believing that he had cooperated with Chapa and the Task Force, might seek retribution.

---

[3]  We apologize for the language.  However, with great respect for the Court, this is what really happened.

"*Curioser and Curioser*"[4]

22.     One would have thought that, having commandeered an innocent citizen's property for a government sting operation, and having had the truck shot to smithereens by banditos and cops alike, the head of the DEA office in Houston would have been apologetic.  Reason would have seemed to dictate that they would act with all deliberate speed to repair or replace Mr. Patty's truck, to compensate him for the economic and other losses suffered by his business and his family, and to provide police protection against any retaliation by the Zetas.

23.     But they did exactly the opposite.  Mr. Peña himself said absolutely nothing to Craig Patty.  But in an interview with Houston Chronicle reporter Dane Schiller a few months later, he commented on the shooting incident as follows:

> "We are not going to tolerate these types of thugs out there using their weapons like the Wild Wild West," said Javier Peña, the new head of the U.S. Drug Enforcement Administration's Houston Division.  "We are going after them."

Reported in chron.com (March 20, 2012).

24.     Mr. Patty does not object to the DEA "going after" the bad guys.  But the Constitution requires that it do so with its own vehicles and its own assets and its own employees.

25.     What the Drug Task Force decided to do instead was to deputize Harris County detective Mark Reynolds,[5] to play the role of "bad cop."  He started by telling Patty that he had to arrange to have his own bullet-ridden, blood-stained truck removed from the scene of the crime, or that he would be charged a daily storage fee.

---

[4]  "Curioser and curioser" Alice muttered, as the events surrounding her in Wonderland became ever more surreal.

[5]  Patty alleges that, under the facts set forth herein, Detective Reynolds' words and conduct are imputable, at minimum to the United States, and, as factually appropriate, to Mr. Peña or other federal agents that may have been authorizing or directing him in this regard.

26.     Patty's truck contained a tracking device known as a "Tele a Tracker."  It is akin to a black box that records the locations where the truck has been.  When the law enforcement officials learned about this device, Detective Reynolds demanded that Patty sign a search warrant, and threatened him with seizure of his truck and trailer if he did not cooperate.  Amazingly, the search warrant that was tendered included authorization to search the Pattys' **home**.

27.     Just as the Supreme Court itself acknowledged in *Bivens*, Mr. Patty had little choice but to cooperate with the authorities.  He scratched out the search warrant provisions about his home, but agreed to let them search his truck.  Therefore, when the Government was unable to retrieve the tracking information, under additional threats and duress from Detective Reynolds, Patty provided them with emails containing detailed information as to where the truck had been, and for how long.

28.     Patty produced the data from the black box because he was threatened by the Drug Task Force officers if he did not do so.  However, it was not without significant misgivings and fears.  Because this data would undoubtedly contain information about the *location* of the Mexican drug lords stash in Rio Grande City, (or Mexico), the disclosure of this information made Patty extremely concerned for the safety of his wife and family.  They feared potential retaliation from the same people who had just gunned down his driver, three of whom are now being prosecuted by the State of Texas for "capital murder."

### The Aftermath

29.     The Government never paid to have Craig Patty's truck repaired.  Nor did his insurance company.  The insurance company took the position that the damage was caused by "unauthorized" or "illegal" activity.  Consequently, Patty ultimately had to take money out of his 401K retirement funds to pay to have the bullet holes and other physical damage to his truck repaired and to have the blood and other stains removed from the cab.

30.     Patty's truck was out of service for approximately 100 days.  In his FTCA claim, he provided documentation of $66,456 in business interruption economic damages resulting from that delay.  The total economic damages are easily quantifiable.  They are $133,532.10.

31.     But the non-economic, intangible damages that flow from such outrageous conduct by the Government are not readily capable of mathematical computation.  Rather, under our system of justice, they are committed to the sound discretion of the trier of fact.  In the Senate Report that accompanied the 1974 amendments to § 1280(h) of the FTCA, described *infra*, the Committee acknowledged that the elements of damages could include not only the "actual physical damage" but also the "pain, suffering and humiliation" of citizens whose rights were trampled by over-zealous federal narcotics agents.  SEN. REPORT No. 93-588, 93rd Congress, *1st Session*, at p. 2.  In his FTCA administrative claim, Patty sought $1,350,000 for such "personal injury" damages, which necessarily include those for the invasion of his privacy and constitutional rights.  Thus, the total amount of damages sought in the FTCA claim was – for both economic losses and "personal injuries" – $1,483,532.10.

## Our Precious Constitutional Rights

32.     The CONSTITUTION of the United States was written and ratified in 1789.  It laid out a structure for the government of the new nation.  But what it did not do was place limitations on the power of that government to intrude into the peaceful lives of its citizens.  That's where the Bill of Rights comes in.

33.     The first ten amendments to the CONSTITUTION, commonly known as the "Bill of Rights" contains safeguards to prevent unwarranted intrusions by the government into the "life, liberty and pursuit of happiness" by ordinary citizens.  Together, they weave a tapestry of protections

that should be precious to every American.  The courts have been their guardians, extending protections and providing remedies that are designed to safeguard and preserve them.

34.     The Second Amendment safeguards the rights of Americans to have guns; but it does not authorize federal agents to bring them onto or into private property without just cause, and it certainly does not permit federal agents to use a man's truck as a decoy that might, and did here, attract bullets from "cops and robbers" alike.

35.     The Third Amendment protects the people against having soldiers involuntarily "quartered" in their homes.  It says nothing about secretly putting a government agent or contractor into one's truck, but it does reflect the Framers' judgment that the new government cannot intrude into private citizens' lives.

36.     The Fourth Amendment provides, in part, that:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ."  In *Griswold,*[6] the Supreme Court held that its "penumbra" extends a right of privacy, not only to one's home, but also to his person and personal affairs.  The Drug Task Force's intentional seizure of Patty's red truck and use of it for its own purposes, and its actions which put him and his family at risk for recriminations from dangerous criminals, trampled Patty's Fourth Amendment rights.

37.     The Fifth Amendment provides that the government shall not take or use a citizen's private property without "due process" and "just compensation."  The Drug Task Force took Patty's truck, and his gas, and the services of his employee, and even, indirectly, the insurance premiums he paid to protect his valuable business property with no process and no compensation whatsoever.

---

[6] *Griswold v. Connecticut*, 381 U.S. 479, 483-84 (1965).

## Deterring Violations of Constitutional Rights

38.     The Supreme Court's *Bivens* decision in 1971 demonstrates that, even in an arena that is so important to our society as fighting the importation of illegal drugs, federal agents must still respect the private lives and property and rights of innocent citizens like Craig Patty, and must still follow the rule of law.  The federal common law constitutional tort recognized in this case is a remedy that is designed to protect those rights, not only by providing a vehicle for compensation, but also by deterring unlawful conduct via the specter of personal liability with potential punitive damages to be assessed by the officers' fellow citizens from the jury box.

39.     The Supreme Court never really named the new constitutional tort that it created in *Bivens*.  But, in 1974, when the Congress passed Pub.L. 93-253, amending 28 U.S.C. § 2680(h) to make the government vicariously liable for such actions by federal "investigative or law enforcement officers" it used the phrase "**abuse of process**."  SEN. REPORT No. 93-588, 93rd Congress, *1st Session*. The facts chronicled herein show – a severe, planned, intentional "abuse of process" and other delictual conduct.

## Theories of Recovery

The foregoing factual allegations are hereby incorporated herein by reference.  They support three major legal claims, as follows:

40.     FIRST:  TORT CLAIMS AGAINST USA.  Under the Federal Tort Claims Act the United States Government is liable "in the same manner and to the same extent as a private individual" except, that its liability is capped at the amount of the presuit administrative claim, *i.e.,* $1,483,532.10, and it has no exposure for prejudgment interest or punitive damages.  28 U.S.C. § 2674.  The "torts" at issue herein are the federal common law "constitutional torts" recognized in *Bivens* and other alleged unlawful, unreasonable conduct herein.  They transcend words and legal

concepts like "negligence" and "conversion."  Rather, as noted above, the best label that one could

put on them is "abuse of process," which is the phrase used by Congress in the 1974 Pub.L. Pub.L.

93-253 amendments to § 2680, that renders the United States vicariously liable for such torts when

they are committed by "investigative or law enforcement officers."

41.     SECOND: CONSTITUTIONAL TORTS BY FEDERAL AGENTS.  Under *Bivens*[7]

and its progeny, Mr. Peña and the unknown individual federal agent defendants, named for the

present as JOHN DOES 1-6, are personally liable for their intentional "constitutional torts."  In this

case, the Officers knowingly and intentionally misappropriated Patty's property without either due

process or just compensation, in violation of the Fifth Amendment, and unreasonably violated his

privacy and seized his property in violation of the Fourth Amendment.

42.     The cause of action for violations of these  "constitutional torts" is determined under

federal common law.  It has *not* been entirely subsumed into the FTCA, and the individual agents

do not have that statutory immunity from suit.  Rather, as the Supreme Court held in *Carlson*, the

FTCA and *Bivens* claims are "parallel and complementary."  *Supra* FN 6.

43.     Under the *Bivens* theory of recovery against the individual officers, Plaintiff is entitled

to a jury trial.  Moreover, because the goal of the courts in recognizing this cause of action was to

deter unlawful behavior by federal offices, exemplary or punitive damages may be assessed.

*Carlson, supra*.

---

[7]     *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971)(Federal agents'
violations of Fourth Amendment rights gives rise to common law constitutional tort liability of
individual agents); *Davis v. Passman,* 442 U.S. 228 (1979)(Violation of Fifth Amendment due
process rights cognizable under *Bivens* tort theory); *Carlson v. Green*, 446 U.S. 14, 20 (1980)(Held:
1974 amendments to FTCA provide a "complementary" cause of action against the Government for
violation of Eighth Amendment rights, but do *not* insulate the individual officers from personal
liability.).

44.     THIRD:    DEPRIVATION  OF  CIVIL  RIGHTS  AND  CONSTITUTIONAL PROTECTIONS BY HARRIS COUNTY, AND OTHERS ACTING "UNDER COLOR OF STATE LAW."  42 U.S.C. § 1983, et.seq. provides a cause of action against state entities and agents that is parallel to the constitutional tort liabilities of federal agents under *Bivens* and its progeny.  Detective Reynolds, and the John Doe 6-12 defendants were acting "under color of state law" within the meaning of this section, and they did subject Craig Patty "to the deprivation of . . . rights [and] privileges secured by the Constitution and laws."  Because they acted within the course and scope of their employment by Harris County, Texas, the county itself is liable under § 1983.  These state agents also conspired and collaborated with federal agents, in the unlawful manner specified herein to violate Patty's Fourth and Fifth Amendment rights.  Accordingly, suit is brought against Harris County, and against these individual officers, pursuant to 42 U.S.C. § 1983.

### Damages

45.     Actual:  As noted above, Patty's administrative claim pursuant to the FTCA claimed total damages in the amount of $1,483,532.10.  Of those, $133.532.10 are for economic damages, including repairs of the truck and business interruption damages.  The remaining $1,350,000 is for "personal injury" claims, including "pain, suffering and humiliation" as described above.  He seeks those same actual damages, from all defendants, jointly and severally, under all theories of recovery herein.

46.     Exemplary:  Neither the United States nor Harris County are liable for punitive damages.  However, both the federal and state officer defendants are liable for exemplary or punitive damages in their individual capacities.  Suit is brought for same.  For notice pleading purposes, Plaintiff suggests that the Jury should assess exemplary damages of at least three times the actual damages sought or awarded, not to exceed Five Million Dollars ($5,000,000).

**Jury Trial Demanded**

47.     The FTCA claims against the United States "shall be tried by the court without a jury." 28 U.S.C. § 2402.  Plaintiff also suggests that the Court should try the § 1983 claims against Defendant Harris County non-jury.  However, the *Bivens* claims against Mr. Peña and the other federal agents, and the § 1983 claims against the individual state actor defendants are triable by Jury, and pursuant to Rule 38, FED. R. CIV. P., Plaintiff hereby demands trial by Jury of those claims. Because of this, as authorized by Rule 39(c), the Court may choose to empanel an "advisory jury" to provide it with guidance regarding the disposition of the claims against the governmental entities.

WHEREFORE, Plaintiff prays that Defendants be cited to appear and answer herein, and that upon the final trial of this case, a Final Judgment be entered by this Court in his favor and against each Defendant as its liability shall appear, as follows:

a.     Awarding actual damages in the amount of $1,483,532.10 against all defendants, jointly and severally;

b.     Awarding exemplary damages, not to exceed the greater of three times the actual damages sought or awarded, or $5,000,000 against the individual defendants;

c.     Awarding Plaintiff his attorney's fees and costs under the § 1983 theory; and

d.     Awarding pre-judgment interest on the *Bivens* and § 1983 claims, costs, and such other and further relief as is just and proper under the findings of the trier of fact and the law in this case.

Respectfully submitted,

**THE VICKERY LAW FIRM**

*/s/ Arnold Anderson Vickery*
Arnold Anderson (Andy) Vickery
Texas Bar No. 20571800
*Attorney in Charge*

Fred H. Shepherd
Texas Bar No. 24033056
10000 Memorial Dr., Suite 888 (77024)
P. O. Box 4340
Houston, TX  77210-4340
Telephone:  713-526-1100
Facsimile:  713-523-5939
Email:  andy@justiceseekers.com
Email:  fred@justiceseekers.com
*Counsel for Plaintiffs*

Mark Bennett
Texas Bar No. 00792970
BENNETT & BENNETT
735 Oxford Street
Houston, TX 77007
Telephone: 713-224-1747
Email: mb@ivi3.com
*Co-Counsel for Plaintiffs*